UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DOUGLAS DANIEL CLARK,     )     CASE NO. CV 92-6567 PA

     Petitioner,     )     **DEATH PENALTY CASE**

     v.     )     ORDER DETERMINING
APPLICABILITY OF AEDPA;
RON DAVIS,[1/] Warden, California     )     DENYING PETITIONER'S
State Prison at San Quentin,     )     MOTION TO STAY; AND
SETTING SCHEDULE FOR
     Respondent.     )     MERITS BRIEFING

There are two issues before the Court: (1) whether the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to this case and (2) whether the proceedings should be stayed because Petitioner's is competent. For the reasons set forth, the Court finds that AEDPA governs these proceedings and denies Petitioner's motion for a stay.

**I.      Procedural History**

On October 23, 1992, Petitioner initiated this action by filing a document entitled "WRIT OF HABEAS CORPUS, FROM A STATE CAPITAL TRIAL

---

[1/]      Ron Davis is substituted for his predecessors as Acting Warden of the California State Prison at San Quentin, pursuant to Federal Rule of Civil Procedure 25(d).

AND APPELLATE PROCESS." (Docket No. 395-1 at Page ID# 1141).[2]

However, it was identified on the docket as a Request for Appointment of Counsel and Extension of Stay of Execution. (*See* Docket No. 370-2 at Page ID# 919.) On November 6, 1992, the Court ordered Petitioner to file a status report indicating whether a date had been set for his execution and whether he had or intended to file a petition for writ of certiorari with the United States Supreme Court. (*See id.*) On November 17, 1992, Petitioner filed his response. (*See id.*)

On November 19, 1992, Respondent filed a Motion to Dismiss the Petition for Writ of Habeas Corpus ("Motion to Dismiss"). Respondent argued that the Court lacked jurisdiction to consider the Petition while the state's review of the judgment of conviction was still pending. (*See id.; see also* Docket No. 395-1 at Page ID## 1152-67.) Additionally, Respondent objected to appointment counsel for Petitioner until the conclusion of state habeas corpus proceedings. (*Id.* at Page ID# 1162-67) Respondent noted that Petitioner appeared to be intentionally attempting to by-pass state collateral review and that by doing so, Petitioner would likely be barred from raising any claims in federal habeas proceedings other than the record-based claims he raised on direct appeal. Accordingly, Respondent urged the Court to dismiss the petition without prejudice to Petitioner refiling his petition after the conclusion of state review. (*Id.*)

On December 8, 1992, the Court issued an order staying this action "[un]til a date of execution has been set." (*See* Docket 370-2 at Page ID# 919.) Shortly thereafter, on December 23, 1992, the Court issued an order noting that Petitioner's state appellate counsel had advised the Court that Petitioner intended to file a petition for writ of certiorari with the United States Supreme Court, that an execution date had been set and that state appellate counsel intended to seek a stay of execution from the California Supreme Court. "Accordingly [the] motion]

---

[2] In the interest of clarity and brevity, documents are cited by docket number and page identification number (Page ID#) only. The Page ID# is affixed to each page of a document scanned into the CM/ECF system and appears at the upper right corner of each page of a document.

by [R]espond[en]t to dismiss [was] taken off/cal[endar]." (*Id.*)  In response to a request for clarification by Respondent, the Court later clarified that not just the hearing, but the entire motion was taken off calendar and that "consideration of the mot[ion] is no longer before this c[ou]rt."  (*See id.*)

On June 24, 1993, Petitioner filed a request to lift the stay and for appointment of counsel.  (*See id.*)  On November 29, 1993, Petitioner's request was granted.  (Docket No. 31.)  On February 2, 1994, the Court appointed attorneys Fred Fujioka and William Hsu to represent Petitioner, and ordered *nunc pro tunc* that their appointment was effective as of September 29, 1993.  (*See* Docket No. 33.)  From the date of their appointment until July 30, 1997, when new counsel was appointed, Petitioner's counsel stayed his execution pending their filing of a petition for writ of habeas corpus, obtained funding for attorneys' fees, an investigator, and a psychosocial historian.  They also began preparation of the petition.  (*See e.g.* Docket Nos. 35-153.)  On April 23, 1997, Petitioner, through his counsel, filed a Petition for Writ of Habeas Corpus.  (Docket No. 150.)

Not satisfied with the Petition filed by his counsel, Petitioner filed *pro se* objections to the Petition (Docket No. 154), a Motion to Dismiss the Petition (Docket No. 161) and a Motion to Dismiss Counsel (Docket No. 169).  After the parties had briefed the issues raised by Petitioner, on July 30, 1997, the Court appointed new counsel, Manuel Araujo, (Docket No. 186) and denied the Motion to Dismiss the Petition (Docket No. 187).  Thereafter, Petitioner filed a *pro se* appeal of the Court's denial of his Motion to Dismiss, which was denied by the Ninth Circuit Court of Appeals on November 12, 1997.  (Docket No. 219).  On November 14, 1997, the Court appointed Michael Magnuson as co-counsel. (Docket No. 227).

On December 12, 1997, Respondent filed a Motion to Dismiss the Petition for Failure to Exhaust.  (Docket No. 220.)  After obtaining additional briefing from the parties (Docket No. 236), on September 29, 2000, the Court issued an order finding certain of Petitioner's claims unexhausted, ordering Petitioner to file

1  an exhaustion petition and holding these proceedings in abeyance pending
2  conclusion of the exhaustion proceedings in the California Supreme Court.
3  (Docket No. 247.)  Additionally, Petitioner was ordered to file a Petition
4  containing only exhausted claims by November 1, 2000.  (*Id.*)  Petitioner timely
5  filed his fully exhausted federal habeas petition.  (Docket No. 248).

6      After counsel successfully sought several extensions of time, but before
7  counsel could file the exhaustion petition in state court, Petitioner filed a *pro se*
8  Motion to Dismiss Counsel (Docket No. 256).  Petitioner's counsel thereafter
9  sought an extension of time to file the exhaustion petition in state court pending
10 the outcome of Petitioner's Motion to Dismiss Counsel (Docket No. 257) and
11 counsel sought funds to hire a psychiatric expert to examine Petitioner to
12 determine his competency (Docket No. 258).   The Court eventually allowed
13 attorney Araujo to withdraw from the case and appointed Jack Cairl as co-counsel
14 to assist attorney Magnuson.  (Docket Nos. 268, 269.)  Thereafter, Petitioner filed
15 his exhaustion petition and a supplemental petition, both of which the California
16 Supreme Court denied on the merits on November 25, 2003.  (Docket No. 275.)

17     On June 22, 2004, Petitioner's counsel filed an Amended Petition for Writ
18 of Habeas Corpus in this Court.  (Docket No. 281).  Meanwhile, Petitioner filed
19 numerous *pro se* documents, complaints and notices regarding counsels' alleged
20 ineffectiveness.  (*See e.g.* Docket Nos. 271, 272, 273, 277, 288, 289).  Petitioner
21 was ordered to stop communicating with the Court *pro se* and the documents were
22 stricken from the record.  (Docket Nos. 287, 292.)  On July 22, 2004, Respondent
23 filed a Motion to Dismiss the Amended Petition (Docket No. 284), which was
24 denied by the Court on February 8, 2006  (Docket No. 290).  Respondent
25 answered the Amended Petition on March 20, 2006, (Docket No. 291), and
26 Petitioner filed his Traverse on May 31, 2006 (Docket No. 297).

27     On July 14, 2006, Respondent filed a Motion to Abate the Proceedings with
28 respect to Claim 5 or alternatively to Appoint Independent Counsel to Represent

4

1  Petitioner Regarding Competency Issues,[3/] (Docket No. 298), which the Court
2  denied in its entirety on October 6, 2006 (Docket No. 305).  Thereafter the parties
3  engaged in discovery regarding Petitioner's competency.
4       On August 7, 2009, the matter was transferred to this Court (Docket No.
5  331.)  On October 7, 2009, this Court ordered the parties to meet and confer and to
6  file a Joint Status Report regarding whether Petitioner's case should be held in
7  abeyance under *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003) or
8  whether the issue of Petitioner's mental status required further briefing.  (Docket
9  No. 332.)  After reviewing the parties Joint Status Report, the Court re-opened
10 discovery regarding Petitioner's competency.  (Docket No. 334.)  The parties
11 continued to conduct discovery until March 28, 2012, when Petitioner filed a
12 Motion to Stay Pending Capital Habeas Proceeding During Petitioner's
13 Incompetence.  (Docket No. 358.)  In his motion, Petitioner argued that the Ninth
14 Circuit's decision in *Rohan* required the Court to stay the case due to Petitioner's
15 incompetence.  On June 15, 2012, Respondent filed his Opposition arguing that
16 pursuant to *Blair v. Martel*, 645 F.3d 1151, 1156-57 (9th Cir. 2011), the Court
17 need not consider staying the case until it determines whether any of Petitioner's
18 claims survive scrutiny under § 2254(d) because until such a determination is
19 made Petitioner's competency is irrelevant. (Docket No. 364.)  Petitioner filed his
20 Reply on July 16, 2012 arguing that Respondent's position was impractical and
21 incorrect, and encouraging the Court to consider Petitioner's competency "a matter
22 that has been in the works for over thirty years," and which, Petitioner argued, was
23 ripe for decision on the merits, without the need for an evidentiary hearing or live
24 testimony, based on the compelling evidence, including expert testimony, that
25 "Mr. Clark is currently incompetent, and has been incompetent for decades."
26 (Docket No. 367 at Page ID## 888, 893.)
27    [3/].    Respondent argued that Claim 5, which sought relief based on Petitioner's
28 incompetency to assist counsel in the prosecution of his habeas petition pursuant to the doctrine of *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), ought not to be decided because granting relief would call into question the validity of the state-court judgment.

5

On February 26, 2013, Petitioner filed a Motion to Amend the Traverse explaining that Petitioner's counsel had recently learned that in 1992, many years before the passage of AEDPA, Petitioner had filed a *pro se* habeas petition in this Court and thus, Petitioner moved the Court to allow him to amend the Traverse to state that this proceeding is governed by pre-AEDPA law.  (Docket No. 370.)  Respondent filed a Response to explain that while he did not object to the amendment, he did not concede that this action was governed by pre-AEDPA law.  (Docket No. 371.)  Concurrently with his Response to Petitioner's Motion to Amend the Traverse, Respondent filed a Notice of Recent Authority Regarding the Issue of Incompetence, advising this Court that on January 8, 2013, the United States Supreme Court decided *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), expressly rejecting the Ninth Circuit's decision in *Rohan* and holding that a petitioner collaterally attacking his state conviction in a 28 U.S.C. § 2254 proceeding has no right to competence, and no right to a stay of the proceedings based on current incompetence.  *Id*. at 702-05.  (Docket. No. 372).

On March 21, 2013, the Court granted Petitioner's Motion to Amend the Traverse, and ordered the parties to file supplemental briefing regarding the impact of *Gonzales* on the case.  (Docket No. 373.)  Petitioner filed his supplemental brief on May 29, 2013 arguing that Respondent failed in any meaningful way to dispute that Petitioner is presently incompetent, that Petitioner alleged several claims that require him to communicate rationally with counsel, and that Petitioner can be returned to competence with proper care and treatment.  (Docket No. 377.)  Respondent filed his supplemental brief on September 24, 2013 arguing that a stay of the proceedings is unwarranted based on the holding in *Gonzales*. (Docket No. 387.)  On October 24, 2013, Petitioner filed his reply refuting Respondent's argument and requesting that the Court exercise its discretion and order a stay of the proceeding pending attempts to restore Petitioner's competence.  (Docket No. 392.)

On July 28, 2015, the Court ordered the parties to brief the applicability of

AEDPA to the Petition.  (Docket No. 394.)  Petitioner filed his brief on August 12, 2015 arguing that AEDPA does not apply because the document Petitioner filed *pro se* in 1992, long before the enactment of AEDPA, was a petition for writ of habeas corpus which asserted federal claims for relief.  (Docket No. 395.)  On September 2, 2015, Respondent filed his brief arguing that the document Petitioner filed in 1992 was not an application for federal habeas relief and that AEDPA applies because Petitioner did not file his actual application for federal habeas relief until April 23, 1997, nearly a year after AEDPA was enacted.  After Petitioner unsuccessfully attempted to file *pro se* a number of documents related to the applicability of AEDPA (Docket No. 399), on November 10, 2015, apparently at Petitioner's behest, his counsel filed a Request for Leave to File an Additional Exhibit in Support of Petitioner's Brief re Applicability of AEDPA (Docket No. 400) seeking the Court's permission to file as Exhibit 5 a document captioned "Motion to Gain Hearing Upon Preliminary Issues Regarding Summary Judgment, and related matters."  The Court granted the request.  (Docket 405).

Currently before the Court are the following two issues: (1) whether AEDPA applies to this case; and (2) whether the proceedings may be stayed because Petitioner is currently incompetent to assist counsel.

## II.    Applicability of AEDPA

Before considering Petitioner's Motion to Stay Capital Habeas Proceeding During Petitioner's Incompetence ("Motion to Stay"), the Court must first determine whether AEDPA governs these proceedings.

### A.    Background

Petitioner argues that AEDPA does not apply to these proceedings because Petitioner's case became "pending" within the meaning of *Garceau v. Woodford,* 538 U.S. 202, 2004 (2003), on October 23, 1992, when he filed a document entitled "Writ of Habeas Corpus, From a State Capital Trial and Appellate Process" ("1992 Document").  In support of his position, Petitioner argues that while the 1992 Document included a request for the appointment of counsel, it

7

1   asserted federal claims under *Faretta* and for ineffective assistance of counsel,

2   claims which remain in the Amended Petition filed on June 22, 2004, the operative

3   pleading in the instant action.  Additionally, Petitioner argues that Respondent

4   understood that the 1992 Document was an application for habeas relief, and not

5   just a request for appointment of counsel, because Respondent moved to dismiss

6   the 1992 Document.[4/]  Respondent argues that the 1992 Document was not an

7   application for habeas relief, but a request for appointment of counsel and

8   Petitioner's *pro se* attempt to identify notable, but not all, issues that should be

9   investigated by counsel once appointed.

**B.   Legal Standard**

10         AEDPA's amendments to Chapter 15 of Title 28 of the United States Code

11  are not applicable to habeas cases that were "pending" in federal courts as of the

12  date of its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320 (1997).

13  In *Woodford v. Garceau,* 538 U.S. 202, 204 (2003), the Supreme Court

14  considered, for the first time, the issue of "when a capital habeas case becomes

15  'pending' for purposes of the rule announced in *Lindh*." *Id.*

16         In *Garceau,* Petitioner initiated his action by filing a motion for

17  appointment of federal habeas counsel and an application for stay of execution.

18  *Id.* at 204.  The District Court granted Petitioner's motion, issued a stay of

19  execution and appointed counsel.  *Id.*  The State moved to vacate the stay, in part

20  because Petitioner failed to file a "specification of nonfrivolous issues," as

21  required by local court rules.  *Id.*  Petitioner cured the noted defect and, as a result,

22  on October 13, 1995, the District Court denied the State's motion and ordered the

23

24  [4/]      Exhibit 5 (Docket No. 400-2) which Petitioner successfully sought to
include in his briefing on the applicability of AEDPA has no bearing on that issue.

25  While filed on April 1, 1996, before the enactment of AEDPA, there can be no
reasonable debate about whether Exhibit 5 is a petition; it is not, which is likely

26  the reason Petitioner's counsel did not seek to introduce it in the first place.
Indeed, if anything, the inclusion of Exhibit5 weakens Petitioner's argument that

27  the 1992 Document is a petition because it suggests that Petitioner is grasping at
straws to ensure that AEDPA does not apply to these proceedings.  Be that as it

28  may, the Court has carefully reviewed Exhibit 5 and finds nothing within the
document which would even suggest that it is an application for a petition for writ
of habeas corpus.  As such, the Court gives Exhibit 5 no further consideration.

Petitioner to file his habeas petition within nine months. *Id.* at 205. Petitioner timely filed his application for habeas relief on July 2, 1996. *Id.*

Pursuant to then governing Ninth Circuit precedent, *see Calderon v. U.S. Dist. Court for Cent. Dist. of California*, 163 F.3d 530, 540 (9th Cir. 1998) (concluding that a petition for appointment of counsel "creates a pending habeas case"), the District Court concluded that AEDPA did not apply to the petition, but denied relief on the merits. *Id.* On appeal, the Ninth Circuit concluded that AEDPA did not apply, but granted relief on the merits. The United States Supreme Court granted certiorari to consider "the precise time when a case becomes 'pending'" for purposes of determining whether the provision of AEDPA apply. *Id.*

The Supreme Court concluded that, in light of "AEDPA's heavy emphasis on the standards governing review of the *merits* of a habeas application, . . . whether AEDPA applies to a state prisoner turns on what was before a federal court on the date AEDPA became effective." *Id.* at 206-207 (emphasis in original). Thus, if a state prisoner "had before a federal court an application for habeas relief seeking an adjudication on the *merits* of the petitioner's claims" on April 24, 1996, then AEDPA does not apply. *Id.* at 207 (emphasis in orignal).. If however, an application was filed after AEDPA's effective date, it "should be reviewed under AEDPA, even if other filings by that same applicant - such as, for example, a request for appointment of counsel or a motion for a stay of execution - were presented to a federal court prior to AEDPA's effective date." *Id.*

The Supreme Court found support for its conclusion in the language of the statute itself. *See id.* at 207-208 (noting that the provisions of § 2254(e)(1), apply to proceedings *instituted by an application for a writ of habeas corpus*," that the power to grant a writ under § 2241(d) "is not triggered except by 'application for a writ of habeas corpus,'" and that the provisions of § 2244(a) prohibit "a second or successive 'application for a writ of habeas corpus' except as provided for by statute"). Additionally, the Court found support in the rules of civil procedure

9

which govern § 2254 cases, *see id.* at 208 (explaining that under Fed. R. Civ. P. 3, "'[a] civil action is commenced by filing a complaint,' which in the context of a habeas suit means "the filing of an application for habeas corpus relief - the equivalent of a complaint in an ordinary civil case"), and came to the "logical conclusion . . . that a habeas suit begins with the filing of an application for habeas corpus relief - the equivalent of a complaint in an ordinary civil case." *Id.*  Thus, the Supreme Court held that "for purposes of applying the rule announced in *Lindh*, a case does not become 'pending' until an *actual* application for habeas corpus relief is filed in federal court." *Id.* at 210 (emphasis added.)

Notably for purposes of this case, in her concurrence, Justice O'Connor opined that "the Court may have misapplied its own rule" because Justice O'Connor believed that Petitioner's pre-AEDPA filing of the "Specification of Non-Frivolous Issues" did set forth the merits of Petitioner's claims. *Id.*  at 211. Justice Thomas, writing for the Court, noted that Petitioner's "Specification of Non-Frivolous Issues," filed by his counsel before the enactment of AEDPA, "plainly stated that '[b]ased on a preliminary review of case materials, counsel believes the following federal constitutional issues exist in this case and are among the issues that may be raised on [Petitioner's] behalf in a petition for habeas corpus."  Thus,

> [t]he clear import of this language is that the filing itself
> did not seek any relief on the merits or place the merits
> of [Petitioner's] claims before the District Court for
> decision.  Rather, the document simply alerted the
> District Court as to some of the possible claims that
> might be raised by [Petitioner] in the future.  Indeed, the
> habeas corpus application respondent eventually filed
> contained numerous issues that were not mentioned in
> the 'Specification of Non-Frivolous Issues.'

*Id.* at 210 n.1.

While *Garceau* establishes when a petition is pending for purposes of determining whether AEDPA applies, Courts look to Rule 2 of the Rules Governing Section 2254 Cases, to determine whether a document filed by a Petitioner is an application for a writ of habeas corpus. *See Hendricks v. Vasquez*, 908 F.2d 490, 491 (9ᵗʰ Cir. 1990) (noting that where a petition "does not meet Rule 2's requirements it "may be returned to the petitioner." (citation omitted)); *Rios v. State Superior Court*, No. EDCV 09-2132-GW (RC), 2010 WL 773322, at *1-2 (C.D. Cal. Feb. 26, 2010) (dismissing as meritless petition that did not comply with the requirements set forth in Rule 2.)  Pursuant to Rule 2, a section 2254 petition must:

(1)    specify all the grounds for relief available to the petitioner;

(2)    state the facts supporting each ground;

(3)    state the relief requested;

(4)    be printed, typewritten, or legibly handwritten; and

(5)    be signed under penalty of perjury by the petitioner or by a person authorized to sign it for the petitioner under 28 U.S.C. § 2242.

Moreover, "'notice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'"  Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (citation omitted); *see also Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting this language when describing the rules governing pleading for Section 2254 habeas petitions as "more demanding" than the notice pleading allowed under Fed.R.Civ.P. 8); *Wacht v. Cardwell*, 604 F.2d 1245, 1246 n.2, 1247 (9th Cir. 1979) (describing the "specificity requirement" for pleading Section 2254 habeas claims); Advisory Committee's Note to Rule 2 (c) of the Rules Governing Section 2254 Cases ("recognizing that [i]n the past, petitions have frequently contained mere conclusions of law, unsupported by any facts . . ., [but] it is the relationship of the facts to the claim asserted that is important . . . ").

11

Further, it is well-established that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *see also Wacht*, 604 F.2d at 1246 n.2 (recognizing that "[b]ald assertions and conclusory allegations" are insufficient to state a federal habeas claim); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970) (noting that "conclusory statements are no substitute for proper allegations of fact," and "[a]llegations of fact, rather than conclusions, are required" in a state prisoner habeas petition). While it is true that *pro se* petitions are held to a more lenient standard than counseled petitions, s*ee e.g.. Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Sanders v. Ryder*, 342 F.3d 991, 999 (9th Cir. 2003); *Peterson v. Lampert*, 319 F.3d 1153, 1159 (9th Cir. 2003), the petition must still allege sufficient facts to state a cognizable claim under 28 U.S.C. § 2254. *See Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (noting that despite the "liberal construction" afforded *pro se* pleadings, a *pro se* petitioner is not entitled to the benefit of every conceivable doubt.").

Finally, the petition must be properly before the court. A federal court may not entertain a habeas petition unless the petitioner has exhausted available and adequate state court remedies with respect to all claims in the petition. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). Thus, a fully unexhausted federal habeas petition may not be stayed and must be dismissed. *See, e.g., Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) (holding that a fully unexhausted petition may not be stayed and observing: "Once a district court determines that a habeas petition contains only unexhausted claims, it need not inquire further as to the petitioner's intentions. Instead, it may simply dismiss the habeas petition for failure to exhaust."); *Jiminez v. Rice*, 276 F.3d 478, 481 (9th Cir. 2001) (a district court is "'obliged to dismiss immediately'" a petition that contains no exhausted claims) (citation omitted); *Romero v. Lewis*, EDCV 10-0982 VBF (JEM), 2010 WL 5579886, at *2 (C.D. Cal. Dec.8, 2010) ("The authority of a court to hold a mixed petition in abeyance pending exhaustion of the unexhausted claims has not

been extended to petitions that are fully unexhausted."). Moreover, during the time period relevant hereto, a district court was required to dismiss a petitioner's habeas petition if even only one of many claims was unexhausted. *Rose*, 455 U.S. at 522; *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991) (noting that "[t]his Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted state remedies as to any of his federal claims.")

Notwithstanding the mandatory exhaustion requirement, where a petitioner can demonstrate that "there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the [petitioner]," the district court may consider petitioner's unexhausted claims. 28 U.S.C. § 2254(b)(1)(B); *see also Woodford v. Ngo*, 548 U.S. 81, 82-83 (2006) (noting that state court remedies are exhausted when they are no longer available regardless of the reason for their unavailability); *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) (explaining that "[t]he exhaustion doctrine, . . . turns on an inquiry into what procedures are "available" under state law); *Coleman*, 501 U.S. at 732 (stating that "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him"); *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (noting that exhaustion may exist if it is clear that petitioner's claims are now procedurally barred); *Hawk v. Olson*, 326 U.S. 271, 276 (1945) (citing *White v. Ragen*, 324 U.S. 760 (1945) and noting that "when the state does not provide corrective judicial process, the federal courts will entertain habeas corpus to redress the violation of the federal constitutional right"). Additionally, it is possible for a habeas petitioner to forgo the presentation of claims to the state court if doing so would be futile. *See Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (explaining that the exception set forth in § 2254 applies when the "corrective process is so clearly deficient as to render futile any effort to obtain relief"). However, a petitioner may not simply bypass the state courts "because he thinks

they will be unsympathetic to the claim." *Engle v. Isaac*, 456 U.S. 107. 130 (1982).  Moreover, to the extent a petitioner seeks to argue that exhausting his or her state remedies would be futile, such a claim "is most compelling where the question is one of pure law, and the circumstances of the individual case are largely irrelevant." *Noltie v. Peterson*, 9 F.3d 802, 806 (9th Cir. 1993).

After carefully reviewing the 1992 Document and relying on the holding in *Garceau,* 538 U.S. at 207, 210, the Court concludes that no "application for habeas relief seeking an adjudication on the *merits* of [ ] petitioner's claims" was before this Court on April 24, 1996, and that Petitioner did not file an application for habeas relief until April 23, 1997, nearly a year after the enactment of AEDPA. Consequently, AEDPA governs these proceedings.

### B.    Analysis

The 1992 Document begins with Petitioner's complaints regarding the excessively slow state appellate process and the alleged incompetence of his state appellate counsel.  (Docket No. 395-1 at Page ID## 1141-42)  Under the heading"factual background," Petitioner sets forth the "facts" supporting his complaints about his attorneys' incompetence and the slow appellate process.  For example, Petitioner notes that he was not appointed state appellate counsel for 17 months, that counsel took over 4 years to certify the trial court record, that state appellate counsel refused to raise "constitutional issues" that Petitioner "repeatedly demanded be raised" which "forced" petitioner "to seek counsel for these issues by filing PRO SE requests for same," and that the state court refused to hold oral argument.  (*Id.* at 1142-44 (emphasis in original)).  Petitioner notes that when the state court finally did rule, it ruled on the issues raised in the briefs filed by counsel and "upon those issues for which PETITIONER had filed REQUESTS FOR COUNSEL." (*Id.* at Page ID#1144 (emphasis in original).) Petitioner questions how the issues he raised in his requests for counsel "can be RULED UPON, based SOLELY UPON THE BRIEFS which ONLY SOUGHT TO GAIN COUNSEL for the issues' presentation." (*Id.* (emphasis in original).)

Petitioner opines that the state court's decision on the merits of the issues he raised in his requests for counsel was "tantamount to a trial judge RULING ON GUILT, when a defendant merely filed a brief ASKING FOR COUNSEL." (*Id.* (emphasis in original).)[5/]

Petitioner next complains that his state appellate counsel refused to prepare the "scores of state writ issues to be presented and subsequently 'exhausted'" and that in 1992 his state habeas case was transferred to a different public defender who had yet to contact Petitioner by the time he filed the 1992 Document.  (*Id.*)

Under the heading "jurisdiction," Petitioner notes that the state "has yet to appoint valid counsel" and complains that the public defender's office is in collusion with the prosecutor.  (*Id.*)  Petitioner then argues that "this case has become EXHAUSTED by the state's adamant refusal to grant a reasonable and honest hearing regarding the DIRECT APPEAL." (*Id.* at Page ID#1145.)  Thus, according to Petitioner:

> since NINE YEARS and more have passed without any
> action upon the scores of writ of habeas corpus issues at
> the state level . . .  even after over FIVE YEARS OF
> REQUESTS for action LODGED BY THE
> PETITIONER to the state court, and DENIED by that
> court . . . , THERE IS NO STATE REMEDY
> AVAILABLE TO THIS PETITIONER, IN THIS CASE.

*Id.* (emphasis in original).

Petitioner notes that he has a choice of waiting for the state public defender to prepare his state habeas petition, or to proceed in federal court solely on the issues decided in connection with his direct appeal.  (*Id.* at Page ID## 1145-46.)

---

[5/]     It is worth noting that Petitioner wishes this Court to act in almost exactly the same way the California Supreme Court acted; action which Petitioner protests in the 1992 Document.  Here Petitioner requests that this Court determine that the 1992 Document is both a request for counsel and a petition raising grounds for relief.  Nevertheless, he takes umbrage when the California Supreme Court determined that the requests for counsel and identification of issues he filed there *were* requests for relief.

However, Petitioner recognizes that the federal court is unlikely to review any of his claims until the state court concludes its habeas review, because the federal court would not want to undertake "piecemeal" review of Petitioner's claims. (*Id.* at Page ID# 1146.)  Petitioner then argues that because the state may not complete state habeas review, the state "WAIVES THE RIGHT TO EXHAUST THOSE ISSUES prior to their full hearing and review in federal court." (*Id.*)  Thus, according to Petitioner, the federal court has jurisdiction over all the issues decided in connection with his direct appeal and "over EVERY issue the Petitioner seeks to raise, previously briefed or not, because the STATE remedy of habeas corpus is a non-available avenue to this petitioner in this case." (*Id.* at Page ID# 1147.)[6/]

Next, Petitioner notes under the heading "writ issues" that "before LISTING the ISSUES . . . [he] seeks COUNSEL to INVESTIGATE the case for same." (*Id.* (emphasis in original.)  He further notes that "it is down right SILLY to limit subsequently appointed counsel to those issues his lay-man client could identify and list in sufficient legalese, within this pro se filing for counsel and notice of writ." (*Id.* (emphasis in original))  Petitioner then identifies "[o]ne set of immense and heretofore never properly briefed issues . . . [,] the horrendous litany of abuse of Petitioner's *Farretta* [sic] rights by the trial court." (*Id.*)  Petitioner states that:

> The state court in effect sifted the record for NON-PRO
> SE conduct, and then decided <u>FARRETTA</u> [sic] can be
> WAIVED by anyone who points out blatant judicial
> abuse by the trial court judge. Obnoxious, or less than
> MEEK AND PASSIVE defendants have no <u>FARRETTA</u>
> [sic] rights, any longer, in this state.  AN ANGRY
> OUTBURST over blatant judicial misconduct which

---

[6/]     Petitioner also reiterates his discontentment with the state court's decision to deny on the merits the issues Petitioner raised in his *pro se* request for counsel stating, that he was only "seeking counsel to INVESTIGATE, PREPARE, FILE AND ARGUE THEM." (Docket No. 395-1 at Page ID## 1146-47 (emphasis in original)).  Again arguing the inverse of what he argues here.  *See* note 4, *supra*.

occurs PRIOR TO THE SAME JUDGE GRANTING
PRO SE RIGHTS, can then be used to REVOKE those
rights.

(*Id.* at Page ID # 1148 (emphasis in original).)

Petitioner then notes that "[t]his area of the state court decision will surely cause a reversal at the federal level." (*Id.*)  Petitioner requests that the court "[t]reat this now as a federal capital petitioner would be heard;" and to assume that "all issues are therefore available at this point, *once counsel has a chance to identify and list them for the Court.*"  (*Id.* (emphasis added))

Finally, under the heading "counsel," Petitioner describes the characteristics he would like, and would not like, in his appointed counsel and names attorney Robert Bryan as an example of the type of attorney he believes the Court should appoint to "investigate and prepare" his "extremely complex" case.  (*Id.* at Page ID# 1148-49.)  Here Petitioner also mentions "IAC issue[s] and [a] claim of actual innocence," and notes that the attorney appointed to represent him should know decisions like *Faretta*, *Gideon* and *Miranda.* (*Id.* at Page ID# 1149.)  Petitioner did sign the 1992 Document, but it was not signed under penalty of perjury.

While the document Petitioner filed *pro se* on October 23, 1992 was entitled a "Writ of Habeas Corpus from a State Capital Trial and Appellate Process, "simply entitling a document "writ of habeas corpus" does not make it so.  Even under the most liberal reading, *see Peyton v. Rowe*, 391 U.S. 54, 64-65 (1968), the 1992 Document is not an application for federal habeas relief.  Except for having been typewritten, the 1992 Document does not satisfy the requirements of Rule 2. It does not specify any grounds for relief or state facts that would support any grounds for relief.  Nor does it request relief.  The 1992 Document is also not signed by petitioner under penalty of perjury.

The 1992 Document is a request for the appointment of counsel to "investigate and prepare" Petitioner's "extremely complex" case; a fact the parties do not dispute.  It also may be Petitioner's notice to the Court that he believes an

exception to the exhaustion requirement applies to his case, and therefore he should not have to wait for the conclusion of his state habeas proceedings before the Court appoints counsel to investigate and prepare a federal habeas petition on his behalf. [7/]

As was also the case in *Gareau*, the "clear import" of the language in the 1992 Document is that rather than seek relief on the merits, or place the merits of Petitioner's claims before the Court for decision, Petitioner sought to alert the Court "as to some of the possible claims that might be raised by [Petitioner] in the future." 538 U.S. at 210 n.1. Additionally, like *Garceau*, the petition eventually filed by Petitioner's counsel contained numerous issues that were not mentioned in the 1992 Document. *See id.*

To be sure, in the 1992 Document Petitioner identifies three seminal Supreme Court cases, *i.e., Farretta, Gideon* and *Miranda*, and mentions ineffective assistance of counsel. However, it strains credulity to suggest that having done so, Petitioner has sufficiently set forth cognizable habeas claims. Petitioner fares no better even if the Court were to assume that Petitioner intended to set forth facts to support a *Faretta* claim[8/] when he commented that:

> The state court in effect sifted the record for NON-PRO
>
> SE conduct, and then decided <u>FARRETTA</u> [sic] can be
>
> WAIVED by anyone who points out blatant judicial
>
> abuse by the trial court judge.  Obnoxious, or less than
>
> MEEK and PASSIVE defendants have no <u>FARRETTA</u>
>
> [sic] rights, any longer, in this state.  AN ANGRY
>
> OUTBURST over blatant judicial misconduct which

---

[7/]     As initially recognized in Respondent's Motion to Dismiss.  (*See* Section I, *supra.  See also*  Docket No. 395-1 at Page ID## 1162-67.)

[8/]     In *Faretta v. California*, 422 U.S. 806, 829-834 (1975), the United States Supreme Court held that Sixth Amendment gives a criminal defendant the right to represent himself provided that he is able to knowingly and intelligently forgo his right to counsel, and that he is able and willing to abide by rules of procedure and courtroom protocol.

occurs PRIOR TO THE SAME JUDGE GRANTING

PRO SE RIGHTS, can then be used to REVOKE those

rights.

(Docket No. 395-1 at Page ID# 1148.)

To the extent they can be understood, Petitioner's allegations are conclusory, vague, and they are unsupported by the record or a statement of specific facts. These allegations do little more than put the Court on notice that a *Faretta* claim may exist and should be investigated by appointed counsel. Standing alone, they are insufficient to state a cognizable federal habeas claim. *See Dows v. Wood*, 211 F.3d 480, 486–87 (9th Cir. 2000) (noting that factual claims not supported by the record present no basis for federal habeas relief); *see also Wacht*, 604 F.2d at 1246 n.2 (describing the "specificity requirement" and recognizing that "[b]ald assertions and conclusory allegations" are insufficient to state a federal habeas claim.").

Even if the 1992 Document was a petition, it was not properly before the Court and was subject to mandatory dismissal. As noted above, when the 1992 Document was filed, the Court was required to dismiss any habeas petition containing an unexhausted claim, even if some of the claims raised in the petition were exhausted. *See e.g.*, *Rose,* 455 U.S. at 522; *Coleman,* 501 U.S. at 731. When Petitioner filed the 1992 Document direct review of the claims he raised on appeal had concluded, but no state habeas petition had been filed. Thus, any of the claims Petitioner allegedly intended to raise in the 1992 Document that were not raised on direct appeal, for example, "IAC issues and a claim of actual innocence," were unexhausted. Under these circumstances, even if the Court determined that the 1992 Document was a petition, it was not properly before the Court and should have been dismissed.[9]

---

[9] It is worth remembering that when the Court stayed this action on December 8, 1992, it did so not for purposes of exhaustion, but "until a date of execution has been set." (Docket 370-2 at Page ID#919.) Moreover, it requires no great leap in logic to conclude that the Court docketed the 1992 Document as a request for

1    To the extent the 1992 Document does set forth supporting facts, those facts
2    relate to Petitioner's argument that an exception to the exhaustion requirement
3    should apply to his case because, according to Petitioner, "there is no state remedy
4    available" to him.  (Docket No. 370-2 at Page ID#926 ).  In support of this
5    argument, Petitioner explains that his state appellate counsel refused to prepare his
6    state habeas petition, that in 1992 his state habeas case was transferred to new
7    counsel, that new counsel had not contacted him and that he had waited nine years
8    without any action being taken regarding the "scores of writ of habeas corpus
9    issues at the state level." (*Id.* (emphasis omitted))  As a result, Petitioner argues
10   that all of his claims, "previously briefed or not" are ripe for review in the district
11   court because the "state remedy of habeas corpus is a non-available avenue to this
12   petitioner in this case." (*Id.* (emphasis omitted)).

13   However, even if the Court concluded that the 1992 Document was a
14   request for appointment of counsel, a petition and a request to allow Petitioner to
15   proceed under an exception to the requirement that he exhaust available state
16   remedies, the 1992 Document fails to demonstrate that any such exception is
17   applicable here.  As noted above, where a petitioner can demonstrate that there is
18   no available State corrective process or that circumstances render such process
19   ineffective to protect petitioner's rights, exhaustion may be waived.  *See* 28.
20   U.S.C. § 2254(b)(1)(B).  In the 1992 Document, Petitioner claimed that the lapse
21   of more than nine years without a state habeas petition having been filed should
22   excuse him from having to first obtain state review of any habeas claims.  Even
23   assuming that the passage of time without more could excuse a federal habeas
24   petitioner's failure to exhaust, here, it was the failure of Petitioner's counsel to *file*
25   the state habeas petition, not the state court's refusal to *rule* on the petition that
26   caused the delay.  Consequently, Petitioner could not have relied on any exception

27
28   appointment of counsel and for stay of execution, not in error, but  because it
     recognized that the 1992 Document was not actually a petition.  Rather than close
     the case or rule on Respondent's Motion to Dismiss, the Court simply allowed the
     case to remain docketed pending further action.

to the exhaustion requirement to allow him to proceed without first having his claims heard in state court.

Accordingly, even under the liberal pleading standard accorded *pro se* documents, the 1992 Document is not a petition for writ of habeas corpus. Even if it was a petition, however, it was not properly before the Court and should have been dismissed. Under either analysis because there was no properly filed application for habeas corpus relief pending when AEDPA was enacted, these proceedings are governed by AEDPA. *See Garceau*, 538 U.S. at 210.

### III.   Stay of Proceeding

Having determined that AEDPA governs these proceedings, the Court next considers Petitioner's Motion to Stay.

### A.   Background

In his original Motion to Stay filed on March 28, 2012, Petitioner alleged that since at least 1980 he has suffered from a mental disease or defect that has prevented him from communicating rationally with his counsel regarding his case. Petitioner explained that "[s]ince the time of [his] arrest and trial, and up to the present day," he has exhibited a "marked and consistent inability to assist or rationally communicate [with] his counsel." (Docket No. 358 at Page ID# 246.) However, Petitioner contended that his ability to rationally communicate with counsel was essential to the proper presentation of numerous claims. Relying on the holding in *Rohan*, 334 F.3d at 819, Petitioner argued that the Court must stay this case because he is incompetent. In support of this argument, Petitioner offered the reports and declarations of three mental health experts – Fred Rosenthal, Ph.D., M.D., Dorothy Otnow Lewis, M.D., and Myla Young, Ph.D.– and the declaration of three of Petitioner's prior attorneys – Larry Pizarro, Verna Wefald and Manuel Araujo.

In his Opposition to Petitioner's Motion ("Opposition"), Respondent contended that under *Blair*, 645 F.3d at 1156-57, the Court need not consider whether Petitioner is competent, until first determining whether any of Petitioner's

1    claims survive scrutiny under § 2254(d).  Additionally, Respondent argued that
2    even if the Court determined that one or more of Petitioner's claims survived §
3    2254(d) scrutiny, whether Petitioner was incompetent remained in dispute.  In
4    support of this argument, Respondent offered the reports and deposition testimony
5    of two mental health experts – Park Dietz, M.D. and Daniel Martell, Ph.D.

6         In his Reply, Petitioner disputed Respondent's claim that *Blair* required the
7    Court to first conduct an inquiry into whether any of Petitioner's claim survived
8    scrutiny under § 2254(d) and argued that Petitioner's competence "is now at issue
9    and can be decided on the merits" without the necessity of an evidentiary hearing
10   or live testimony.  (Docket No. 367 at Page ID## 888, 893.)  Moreover, Petitioner
11   maintained that his ability to rationally communicate with counsel was necessary
12   to the proper presentation of nine of his federal habeas claims and that because
13   Petitioner was incompetent to assist counsel, these proceedings should be stayed.

14        Before the Court had ruled on Petitioner's Motion to Stay, on March 13,
15   2013, Respondent filed a Notice of Recent Authority re Issue of Incompetence
16   (Docket No. 371), alerting the Court to the United States Supreme Court decision
17   in *Ryan,* 133 S.Ct. 696 (2013), expressly rejecting *Rohan* and holding that a
18   petitioner collaterally attacking his state conviction in a § 2254 proceeding has no
19   right to competence, and no right to a stay of the proceeding based on current
20   incompetence.  In light of the holding in *Ryan*, the Court sought supplemental
21   briefing from the parties regarding its impact on Petitioner's Motion to Stay.

22        By the time he filed his Supplement Brief, Petitioner had narrowed down to
23   three–Claims 1, 2 and 8–the claims which required him to be able to rationally
24   communicate with his counsel.  Claims 1 and 2 allege violations of Petitioner's
25   rights under *Faretta* pre-trial and after trial had commenced, respectively.  Claim 8
26   alleges ineffective assistance of trial counsel.  In his Supplemental Brief,
27   Petitioner argued that in order to properly present these three claims he must be
28   able to rationally communicate with his counsel, that Respondent failed in any
     meaningful way to dispute that Petitioner is presently incompetent and, for the

1   first time, that Petitioner could be returned to competence with the proper care and
2   treatment.

3       In Respondent's Supplemental Brief, he argued that the holding in *Gonzales*
4   precludes a stay of these proceedings because Claims 1, 2 and 8 are record-based
5   claims. Specifically, Respondent argued that the holding in *Cullen v. Pinholster*,
6   131 S.Ct. 1388 (2011) limits "review under § 2254(d)(1) . . . to the record that was
7   before the state court that adjudicated the claim on the merits," regardless of
8   whether the claim was first raised on direct or collateral review in the state court.
9   *Id.* at 1398, 1402-06. Additionally, Respondent argued that the holding in
10  *Gonzales* makes clear that petitioners have no right to be competent during a
11  federal habeas proceeding and that although the district court retains the discretion
12  to grant a stay, a stay is not generally warranted where, as here, all of Petitioner's
13  claims are based on the record before the state court when it considered
14  Petitioner's claims on appeal or in state habeas proceedings. Thus, Respondent
15  argued, Petitioner's input is precluded, and even if Petitioner's input were
16  allowed, he is competent, thus no stay is required. Finally, Respondent argued
17  that Petitioner had failed to demonstrate why the extra-record information he
18  could provide was necessary to the presentation of his claims.

19      In his Reply, Petitioner reiterated the arguments he made in his
20  Supplemental Brief and requested that the Court exercise its discretion and order a
21  stay of the proceeding pending attempts to restore Petitioner's competence.
22  Additionally, citing *Coleman v. Brown*, Case No. 2:90-cv-00520-LKK-JFM,
23  litigation pending in the Eastern District of California regarding the provision of
24  mental health services to prisons in California, including condemned prisoners
25  housed at San Quentin State Prison. Petitioner argued that because Respondent's
26  counsel is involved in the *Coleman* case counsel should have been able to, but did
27  not, address whether services were available to restore Petitioner's competency.
28  Finally, Petitioner argued that requiring him to demonstrate why the extra-record
    information counsel seeks to obtain from him is relevant to the presentation of

1     Petitioner's claims puts Petitioner in the unfair position of having to explain what

2     he would communicate to counsel if he were competent.[10/]

3                **B.**    **Legal Standard**

4        When Petitioner first moved for a stay in 2012, *Rohan* was the controlling

5     authority in this Circuit.  In *Rohan*, the Ninth Circuit concluded that there was

6     statutory support, in the form of what became 18 U.S.C. § 3599, for the notion that

7     a federal petitioner has a right to competence in federal habeas proceedings, and

8     that it would be a denial of that right if the Court refused to enter a stay where an

---

9

10 [10/]     In their Supplemental Briefs Petitioner and Respondent engage in a "battle of the footnotes" over the import of *Gonzalez v. Wong,* 667 F.3d 965 (9th Cir. 2011) and its potential impact in this case.  Petitioner notes that if this Court finds that AEDPA applies and denies a discretionary stay, he "would be compelled to bring a motion for a stay based upon *Gonzalez,* 667 F.3d at 972, in order to give Petitioner an opportunity to return to state court and present his competency at trial claim with the benefit of the materials that were not a part of the record at the time of the California Supreme Court decision." (Docket No. 377 at Page ID# 997 n.2.)  Respondent counters that *Gonzalez,* provides petitioner with no basis for a stay here because in *Gonzalez* petitioner raised a claim under *Brady v. Maryland,* 373 U.S. 83 (1963), and the Ninth Circuit entered a *Rhines* stay based on the following:

> (1) it could not 'fault Gonzalez for a lack of diligence with respect to the withheld reports'; (2) '[r]esponsibility for the late appearance of those documents lies with the state'; and (3) ignoring 'the materials that did not emerge until the federal habeas proceedings would be to reward the prosecutor for withholding them.' *Id.* at 979. No such circumstances exist here. *See Thompson v. Runnels,* 705 F.3d 1089, 1100-01 (9th Cir. 2013) (*Gonzalez v. Wong* was "not applicable" because that petitioner "had been unable to present his claim in state court because of the state's suppression of evidence" but, unlike Gonzalez, Thompson could have presented the evidence to the state court).

(Docket No. 387 at Page ID## 1055-56 n.3.)  The Court is mindful that courts in this district interpreting *Gonzalez* under circumstances similar to those here have concluded that state suppression of evidence must be established to warrant a stay. *See e.g. Jiminez v. McEwen*, No. CV 12–2359–VAP (JEM), 2014 WL 4105426, * 2 (C.D. Cal. Aug. 18, 2014) (concluding that a stay was not warranted where, unlike in *Gonzalez,* there was no state supersession of evidence); *Ruff v. Hall*, No. EDCV 04–1330–MMM (MAN), 2013 WL 5492489. *17 (C.D. Cal. Sept. 30, 2013) (same); *Griffin v. Marshall*, No. EDCV 09–1424–DOC (AGR), 2012 WL 4069683, * 6 n.10 (C.D. Cal. Jan. 25, 2012) (same).  Other districts have drawn the same conclusion. *See e.g., Carter v. Chappell*, No. 06cv1343 BEN (KSC), 2013 WL 856244, *3 (S.D. Cal. June 3, 2013).  However, the Court need not, and does not, draw any conclusions regarding *Gonzalez*' application to this case because this issue is not presently before it.

11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28

24

incompetent capital habeas petitioner raises claims that could potentially benefit from his ability to communicate rationally. *Rohan*, 334 F.3d at 819. With the Supreme Court's unanimous decision in *Gonzales*, the legal landscape has shifted.

In *Gonzales*, the Supreme Court granted certiorari to determine whether the "federal statute guaranteeing federal habeas petitioners on death row the right to federally-funded counsel," 18 U.S.C. § 3599, and the federal statute governing competency proceedings for federal criminal defendants, 18 U.S.C. § 4241, "provide[ ] a statutory right to competence in federal habeas proceedings." *Id*. at 701–02. The *Gonzales* Court considered two cases from the United States Court of Appeals *In re Gonzales*, 623 F.3d 1242 (9th Cir. 2010) and *Carter v. Bradshaw*, 644 F.3d 329 (6th Cir. 2011).

After exhausting his post-conviction remedies in the Arizona state courts, Mr. Gonzales filed a § 2254 petition in district court. *Gonzales*, 133 S.Ct. at 700. "While the petition was pending, Mr. Gonzales' appointed counsel moved to stay the proceedings, contending that Mr. Gonzales was no longer capable of rationally communicating with or assisting counsel." *Id*. Relying on *Rohan*, the district court denied a stay "after concluding that the claims properly before it were record based or resolvable as a matter of law and thus would not benefit from Gonzales' input." *Id*. at 701. "The [district] court found it unnecessary to determine whether Gonzales was incompetent, though it did find that he possessed at least a limited capacity for rational communication." *Id*. (quotation marks omitted). Mr. Gonzales then filed "an emergency petition for a writ of mandamus in the Ninth Circuit." *Id*. While his case was pending before it, the Ninth Circuit decided *Rohan*. Applying *Rohan*, the Ninth Circuit granted the writ of mandamus, "concluding that even though Gonzales' 'exhausted claims are record-based or legal in nature, he is entitled to a stay pending a competency determination' under 18 U.S.C. § 3599." *Id*. (quoting *In re Gonzales*, 623 F.3d at 1244).

After examining the text of § 3599, and considering the distinctions between the right to counsel at trial under the Sixth Amendment and the right not

25

to be tried if incompetent under the Due Process Clause, the Supreme Court squarely rejected the Ninth Circuit's holding that the right to counsel in § 3599 created a right to be competent in federal habeas proceedings. *Id.* at 702–06. The Supreme Court explained:

> We are not persuaded by the Ninth Circuit's assertion that a habeas petitioner's mental incompetency could eviscerate the statutory right to counsel in federal habeas proceedings. Given the backward-looking, record-based nature of most federal habeas proceedings, counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence. Indeed, where a claim is adjudicated on the merits in State court proceedings, counsel should, in most circumstances, be able to identify whether the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, without any evidence outside the record.

*Id.* at 704–05 (internal citation and quotation marks omitted).[11]

---

[11]     Although the Gonzales Court granted certiorari to decide whether there was a statutory right to be competent during federal habeas proceedings, the Court observed that the Ninth Circuit's decision in *Rohan* also involved an assertion of a right to be competent in habeas proceedings that arises from the Due Process Clause. The Ninth Circuit concluded that Mr. Gonzales' due process claim "raised 'substantial' 'constitutional questions.' " *Gonzales*, 133 S.Ct. at 703–04 (quoting *Rohan*, 334 F.3d at 814). The Supreme Court found this conclusion "puzzling" in light of the fact that the Ninth Circuit had plainly acknowledged that "there is no constitutional right to counsel on habeas" and that "there is no due process right to collateral review at all." *Id.* at 704. The Court flatly rejected the Ninth Circuit's conclusion, stating that "[t]he Ninth Circuit was simply incorrect in suggesting

26

Sean Carter's case was in a different procedural posture than Mr. Gonzales'. After he exhausted his state court remedies in Ohio, Mr. Carter initiated his federal habeas proceedings. *Id*. at 701. "Carter eventually filed a third amended petition, along with a motion requesting a competency determination and a stay of the proceedings," which the district court granted. *Id*. After psychiatric evaluations and a competency hearing, "the District Court found Carter incompetent to assist counsel." *Id*. Applying *Rohan*, the district court determined that "Carter's assistance was required to develop four of his exhausted claims." *Id*. "[T]he court dismissed [Carter's] habeas petition without prejudice and prospectively tolled the statute of limitations." *Id*.

Like the Ninth Circuit, the Sixth Circuit concluded that petitioner's have a statutory right to competency during federal habeas proceedings. The Sixth Circuit located this statutory right to competence in 18 U.S.C. § 4241, relying on the Supreme Court's application of §4241 in staying the petition for writ of certiorari in *Rees v. Peyton*, 384 U.S. 312 (1966).

In *Rees*, a death-sentenced petitioner, through counsel, filed a petition for writ of certiorari. *Id*. at 313. About one month after the petition was filed, petitioner sought to withdraw it and forego any other efforts to save his life. *Id*. Petitioner's counsel informed the Court that he questioned petitioner's competence to make such a decision and that counsel could not ethically withdraw the petition without petitioner first undergoing a competency evaluation. *Id*. While petitioner's expert concluded that petitioner was incompetent, the state's expert doubted such was the case. *Id*. Consequently, the Supreme Court ordered the district court to make a "judicial determination as to petitioner's competence" and citing what later became 18 U.S.C. § 4241, encouraged the Court to subject petitioner to appropriate psychiatric and medical testing, and even hospitalization, if necessary. *Id*.

───────────────

that, in [Gonzales'] case, there might be a constitutional concern." *Id*.

In *Carter*, the Sixth Circuit held that "[b]y applying section 4241 to habeas actions," *Rees* "defines a statutory right for the petitioner to be competent enough to (1) understand the nature and consequences of the proceedings against him, and (2) assist properly in his defense." *Carter*, 644 F.3d at 333. The Sixth Circuit ordered that Carter's petition be stayed indefinitely "with respect to his ineffective assistance claims and any other claims that . . . require his assistance." *Id*. at 337; see also *Gonzales*, 133 S.Ct. at 702.

In *Gonzales*, the Supreme Court rejected the Sixth Circuit's conclusion, explaining that its decision in *Rees* "did not recognize a statutory right to competence in federal habeas proceedings," and indeed that § 4241 "does not even apply to such proceedings." *Id*. at 706; *see also id*. at 705–07.

Having decided that there was no statutory right to be competent in federal habeas proceedings, the *Gonzales* Court turned to Mr. Gonzales' and Mr. Carter's arguments that the district courts have the "equitable power to stay proceedings when they determine that habeas petitioners are mentally incompetent." *Id*. at 707; *see also id*. at 707–09. The Supreme Court reaffirmed that "[d]istrict courts . . . ordinarily have authority to issue stays, where such a stay would be a proper exercise of discretion," and the parties agreed that "AEDPA does not deprive district courts of [this] authority." *Id*. at 708 (quoting *Rhines*, 544 U.S. at 276 (citation omitted)). However, the parties disagreed about the "types of situations in which a stay would be appropriate and about the permissible duration of a competency-based stay." *Id*. Significantly, for the purposes of resolving the cases before it, the Court found that "it [was] unnecessary to determine the precise contours of the district court's discretion to issue stays" and thus, the Court "address [ed] only [the] outer limits" of that discretion. *Id*.

With respect to Mr. Gonzales, the Supreme Court held that the district court did not abuse its discretion in denying a stay "because a stay is not generally warranted when a petitioner raises only record-based claims subject to 28 U.S.C. § 2254(d)." *Id*. The Court emphasized that the "district court correctly found that

all of Gonzales' properly exhausted claims were record based or resolvable as a matter of law, irrespective of Gonzales' competence." *Id*. The Court explained that "review of such claims 'is limited to the record that was before the state court that adjudicated the claim on the merits.'" *Id*. (quoting *Pinholster*, 131 S.Ct. at 1398). Thus, "any evidence that a petitioner might have would be inadmissible." *Id*.

With regard to Mr. Carter, the Supreme Court noted that the district court had "concluded that four of Carter's claims could potentially benefit from Carter's assistance." *Id*. at 708–09. Because "three of these claims were adjudicated on the merits in state postconviction proceedings," the Supreme Court concluded they were subject to review under § 2254(d). *Id*. at 709. As the Court found with respect to Mr. Gonzales, "[a]ny extrarecord evidence that [Mr.] Carter might have concerning these [three] claims would therefore be inadmissible." *Id*. Thus, the Court concluded that these claims did not warrant a stay. *Id*. With respect to Mr. Carter's fourth claim, the Supreme Court could not determine from the record whether this claim, alleging ineffective assistance of appellate counsel, was exhausted. *Id*. at 709 & n. 16. But, even assuming this "claim was both unexhausted and not procedurally defaulted," the Court concluded that "an indefinite stay would be inappropriate" because "[s]taying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings." *Id*. (quoting *Rhines*, 544 U.S. at 277). The Court made clear that "[w]ithout time limits [on stays], petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review." *Id*. (alteration in original) (quoting *Rhines*, 544 U.S. at 277–78). Ultimately, because the district court in Mr. Carter's case had deferred ruling on the procedural default issue, the Supreme Court left the fourth claim for the district court to resolve on remand. *Id*. at n. 16. However, the Court constrained the district court's discretion on remand in the following way:

1
2
3
4
5
6
7
8

> If a district court concludes that the petitioner's claim
> could substantially benefit from the petitioner's
> assistance, the district court should take into account the
> likelihood that the petitioner will regain competence in
> the foreseeable future. Where there is no reasonable hope
> of competence, a stay is inappropriate and merely
> frustrates the State's attempts to defend its presumptively
> valid judgment.

9   *Id*. at 709.[12]

10      Where AEDPA applies, *Gonzales* make two things very clear.  First, even

11  where a claim might benefit from a petitioner's reasoned input, if the claim is

12  record-based, petitioner's input is not just unnecessary, it is prohibited.  *Gonzales*,

13  _____

14  [12]      While this portion of the *Gonzales* opinion may be *dicta*, the Ninth Circuit
    has counseled against dismissing the *dicta* of the United States Supreme Court.

15  *See United States v. Baird*, 85 F.3d 450, 453 (9th Cir. 1996) (noting that "we treat
    Supreme Court dicta with due deference ") (emphasis added*); Zal v. Steppe*, 968

16  F.2d 924, 935 (9th Cir. 1992) (Noonan, J., concurring and dissenting)

17  (acknowledging that Supreme Court *dicta* "have a weight that is greater than
    ordinary judicial dicta as prophecy of what that Court might hold"; accordingly,

18  we do "not blandly shrug them off because they were not a holding."); *see also*

19  *Fouts v. Maryland Cas. Co.*, 30 F.2d 357, 359 (4th Cir. 1929) (noting that
    "certainly dicta of the United States Supreme Court should be very persuasive.");

20  *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008) (quoting *Myers v. Loudoun*

21  *County Pub. Schs.*, 418 F.3d 395, 406 (4th Cir.2005)) (explaining that "we are
    mindful that dicta of the U.S. Supreme Court, although non-binding, should have

22  'considerable persuasive value in the inferior courts.' ")  Indeed, the Supreme

23  Court has itself cautioned against disregarding its *dicta*.  *See County of Allegheny*

24  *v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 668
    (1989) (Kennedy, J., concurring in judgment in part and dissenting in part) ("As a

25  general rule, the principle of stare decisis directs us to adhere not only to the

26  holdings of our prior cases, but also their explications of the governing rules of
    law"); *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 490 (1986) (O'Connor, J.,

27  concurring in part and dissenting in part) ("Although technically dicta, . . . an
    important part of the Court's rationale for the result that it reache[s] is entitled to

28  greater weight . . .").

133 S.Ct. at 708; *see also Pinholster*, 131 S.Ct. at 1398.  Second even if a petitioner's claims are unexhausted and not procedurally defaulted–and thus not confined by the strictures of § 2254(d)–an indefinite stay is not appropriate when a return to competence is unlikely.  *Gonzales*, 133 S.Ct. at 709.

### C.    Analysis

The parties disagree about whether Petitioner is incompetent.  However, whether Petitioner is competent or not, ultimately makes no difference here.  First, the Court has already determined that AEDPA applies to these proceedings, and neither party argues that any of Petitioner's claims are unexhausted, thus only the record that was before the state court–on appeal and in state habeas proceedings–may be considered by this Court.  Any extrarecord evidence that petitioner might have concerning Claims 1, 2 and 8 is therefore inadmissible.  *See Gonzales*, 133 S.Ct. at 708 (noting that review of exhausted claims "is limited to the record that was before the state court that adjudicated the claim on the merits" (citation omitted)).  Under these circumstances, Petitioner's competence is irrelevant, and the Court could deny Petitioner's Motion to Stay on this basis alone.  Second, even if the Court concluded that Petitioner was incompetent, the evidence before the Court admits of only one conclusion, Petitioner is unlikely to be returned to competence anytime soon.  *See id.* at 709 (explaining that "[w]here there is no reasonable hope of competence, a stay is inappropriate and merely frustrates the State's attempts to defend its presumptively valid judgment").  Finally, even assuming that Petitioner were incompetent, but could be returned to competence in the foreseeable future, and assuming that extra-record evidence were admissible, Petitioner has not established that the extra-record evidence he seeks to obtain is sufficiently necessary to the proper presentation of his claims to warrant a stay.

1.    Even if Incompetent, There is Virtually No Reasonable Hope that Petitioner Can be Returned to Competence in the Foreseeable Future.

31

In connection with his original Motion to Stay, Petitioner submitted reports from three mental health experts; Fred Rosenthal, Ph.D, M.D., who also submitted a declaration, Dorothy Otnow Lewis, M.D., and Myla Young, Ph.D. The evidence submitted by these experts was silent as to the prospect of Petitioner being returned to competence.  Indeed, none of the three experts, save Dr. Lewis, actually diagnosed Petitioner with a specific condition, and all three experts suggest that whatever ails Petitioner is of long-standing origin and intractable.

In a 1990 Report, after conducting more than 40 hours of interview with Petitioner, his parents, ex-wife and former girlfriend, extensive review of Petitioner's trial transcripts, review of available reports and notes of psychiatric trial experts, school, psychological, medical and military records, Dr. Lewis opined that at the time of his trial Petitioner was "in the manic phase of a longstanding bipolar mood disorder."  (Docket No. 358-2 at Page ID# 278.)

Further, Dr. Lewis noted that during three post-trial meetings with Petitioner, "his behavior was similar to his behavior during his trial."  (*Id.* at Page ID# 285.)  Finally, Dr. Lewis concluded that when she saw Petitioner he was psychotic and "clearly not competent to assist in his own defense[, and that] the [trial] transcripts indicate[ ] that he was similarly impaired at [the] time of trial." She suggested that Petitioner be transferred to a psychiatric hospital for treatment. (*Id.* at Page ID# 286.)

In a 2007 Report, after conducting a wide array of neuropsychological tests on Petitioner over two days at San Quentin prison and reviewing Dr. Lewis' report and declaration, and Petitioner's psychiatric and medical records from San Quentin, Dr. Young opined that Petitioner should be evaluated for psychotic disorder, depression disorder (with psychotic features) and bipolar disorder (with psychotic features).  Notwithstanding her opinion that Petitioner should be evaluated for a number of mental health disorders, Dr. Young noted, after reviewing Petitioner's prison medical records, that there was no evidence that

1    Petitioner had been prescribed psychotropic medications while in prison.  (*Id.* at

2    Page ID# 326.)

3         In a 2007 Report to counsel, prepared after meeting with Petitioner three

4    times at San Quentin prison and after reviewing "numerous records and reports"

5    including the results of Dr. Young's psychological tests, Dr. Rosenthal opined

6    that Petitioner was likely suffering from bipolar disorder or schizoaffective

7    disorder.  (*See id.* at Page ID# 255.)  Dr. Rosenthal noted that in his contacts with

8    Petitioner over three years, Petitioner's "presentation has always been the same."

9    (*Id.* at Page Id# 253.)  Further, Dr. Rosenthal revealed that Petitioner "has never

10   accepted the possibility that he has mental problems."  (*Id.*)

11        In a March 20, 2012 Declaration, prepared approximately 5 years after his

12   initial report and after a fourth in-person meeting with Petitioner and additional

13   records review, including the report of Respondent's expert Park Dietz, M.D., the

14   transcript of Dr. Dietz interview with Petitioner and the declarations of

15   Petitioner's prior attorneys, Dr. Rosenthal noted that his conclusions regarding

16   Petitioner's "mental capacity" were essentially unchanged from his earlier report.

17   (*Id.* at Page ID# 265).

18        In connection with his Opposition, Respondent submitted the reports and

19   deposition testimony of two mental health experts; Dr. Dietz and Daniel Martell,

20   Ph.D.

21        In a 2007 Report, after one in-person meeting with Petitioner and a review

22   of trial transcripts and prison records, Dr. Dietz concluded that Petitioner was

23   competent.  Although Dr. Dietz opined that Petitioner could be suffering from a

24   personality disorder, he noted that such a disorder would not render Petitioner

25   incompetent.  (Docket No. 364 at Page ID## 671-72.)  Dr. Dietz noted that

26   Petitioner believes he is competent and "wants to be found competent."  (*Id.* at

27   Page ID# 671.)  Additionally, Dr. Dietz noted that Petitioner's prison medical

28   records reflected that:

(1)     on June 20, 1983, approximately 3 months after his arrival at San Quentin State Prison, John Geiger, M.D., a staff psychiatrist at the prison examined Petitioner and "observed no indication of mental disease or disorder, . . . [and] no evidence of thought disorder. . .."  Dr. Geiger diagnosed Petitioner with Antisocial Personality Disorder and opined that there is "no indication at present for special diagnostic or treatment procedure;"

(2)     on June 24, 1983, Petitioner was examined by the Neuropsychiatric Committee at San Quentin prison, which was made up of Dr. Geiger, Robert Slater, M.D., another staff psychiatrist, and R. Bruce Dalnard, M.D, chief psychiatrist, and Petitioner was found to be "'presently sane' within the meaning of the California statute;"  and

(3)     on  July 18, 1983, after undertaking a detailed review of Petitioner's records, engaging in a clinical interview with Petitioner and giving Petitioner several psychological tests, Maurice Lyons, Ph.D., a staff psychologist at San Quentin prison, found "[n]o evidence of psychosis, organic brain dysfunction, or serious psychological impairment in social functioning." However, Dr. Lyons noted that Petitioner was "highly manipulative and shallow, with a superficiality masking a rather serious characterological disorder."  Dr. Lyons' diagnosed Petitioner with sexual sadism, necrophilia, alcohol abuse, in remission, and borderline personality

1  disorder with prominent narcissistic, antisocial and

2      histrionic features.

3  (*Id.* at Page ID## 654-55; *see also* Docket No. 403-9 at Page ID ## 1604-11.)

4      In a 2008 Report, Dr. Martell opined that although Petitioner has sufficient

5  present ability to consult with and assist his attorneys, "he has definite ideas

6  about how his case should be pursued and little tolerance for attorneys who do

7  not share his vision." (Docket No. 364 at Page ID# 807.) Dr. Martell concluded

8  that for Petitioner "cooperating with counsel is a choice driven not by major

9  mental disorder, but rather by his personality and fundamental beliefs about how

10 to proceed in his own best interests . . ." (*Id.*)

11     In his March 24, 2009, deposition, Dr. Dietz testified that, in his opinion,

12 Petitioner is competent but unwilling, rather than incapable, of rationally

13 communicating with his counsel. (*Id.* at Page ID## 776-77.)[13] In an effort to

_____

15 [13]    In an effort to understand Dr. Dietz opinion that Petitioner is unwilling, not
incapable of rationally communicating with his counsel, Petitioner's counsel
16 presented Dr. Dietz with the following hypothetical, abbreviated here, which he
asked Dr. Dietz to analyze: why would a man stand on a street corner for eight
17 hours a day and press the "walk" button every time the "don't walk" signal
appears, but never cross the street? Petitioner's counsel suggested that a layperson
18 would conclude that this man had a mental health issue that prevented him from
crossing the street. Petitioner's counsel likened this hypothetical to Petitioner's
19 situation stating:

20      if we conclude that over a period of many years there has
been very little ability on Mr. Clark's part to
21      communicate with his lawyers, do we at a certain point
conclude that there must be something wrong and it isn't
22      just that he doesn't want to or isn't willing to
communicate rationally with his lawyers but that he's not
23      capable of it?

24 (Docket No. 364 at Page ID# 778.) Dr. Dietz' analysis began with an assessment
of what the man standing on the street corner might find rewarding about his
25 behavior, for example, he might find something rewarding in pressing the button,
seeing the light change, or simply standing at the light. Dr. Dietz than
26 extrapolated this "reward-focused" analysis to Petitioner's behavior in choosing
not to cooperate with his lawyers. Dr. Dietz explained that:

27      If we look at Mr. Clark's case, assuming that he
28      keeps doing the same thing with his lawyers, with many
different lawyers over many years, one of the inferences

clarify his opinion, Dr. Dietz explained that he defined "mental disease" as a condition caused by neuropathology, which means an abnormality of the brain. (Docket No. 364 at Page ID# 767.)  Dr. Dietz clarified that he "preserve[s] the term mental disease very specifically to conditions that may cause psychosis." (*Id.*)  Dr. Dietz explained that he draws a "bright line" distinction between psychosis and the nondiseased mental disorders.  (*Id.*)  Dr. Dietz defined a mental defect as a neuropathological condition, such as "mental retardation," which is the "consequence of severe brain impairment, the impairment of brain function to a severe degree." (*Id.* at Page ID# 773.)  Finally, Dr. Dietz defined personality disorders as psychopathological, but not neuropathological, not based on an abnormality in the brain. (*Id.* at Page ID# 772.)  Accordingly, because Petitioner did not manifest any mental disease or defect, Dr. Dietz concluded that Petitioner did not have a neuropathological condition that could render him incompetent. (*Id.* at Page ID## 772-76.)

Dr. Dietz was re-deposed in 2012. During this deposition Dr. Dietz explained that he had obtained new information that suggested Petitioner suffered from bipolar disorder.  (Docket No. 364 at Page ID# 792.)  Dr. Dietz then endeavored to reevaluate the materials he received relative to Petitioner in the

---

that could be true is inability to do anything different. Another possibility that could be true is that he finds it rewarding to be a jerk, lord it over his lawyers, call them names and feel superior to them; that there's something in it for him to behave this way. And if you were to tell me that his behavior is destructive to his appeal and changes his chances of becoming a free man from five percent to zero percent, changes the chance of his evading execution from ten percent to zero percent so that it is really self-destructive to behave this way, I'd want to look long and hard at whether the rewards he thinks he's getting from it outweigh those advantages that you're offering him to do it your way.

     If he's going to die in prison without being executed no matter how his appeals go, he might as well have his fun and stay his own boss.

(*Id.*)

light most favorable to finding a diagnosis of bipolar disorder.  (*Id.*)
Nevertheless, Dr. Dietz concluded that Petitioner had a personality disorder and
did not have bipolar disorder.  (*Id.*)  Dr. Dietz based this finding on three things:
(1) the three psychological tests administered by Dr. Martell, are, according to Dr.
Dietz the best-established personality tests that exist, and yet these tests showed
no evidence of depression or mania; (2) there is no evidence that Petitioner has
suffered from a sleep disorder characterized by decreased need for sleep, which
Dr. Dietz noted was almost invariably present in bipolar disorder; and (3) Dr.
Dietz failed to locate any evidence in the materials made available to him that
suggested that Petitioner's symptoms or unusual behaviors have an episodic or
cyclic nature, which is an essential element of bipolar disorder.  (*Id.* at Page ID##
792-93.)  Dr Dietz noted that all studies about which he is aware, demonstrate
that the "average duration of a manic cycle is two to seven months."  (*Id.* at Page
ID# 793.)  He found one case in which "a manic episode lasted a full year," but
noted that in Petitioner's case "we're talking about more than 20 years, as far as I
know" and he did not think it was possible to have a manic episode for 20 years.
(*Id.*)

On March 25, 2009, Dr. Martell was deposed and testified, similarly to Dr.
Dietz, that a mental defect would manifest as "mental retardation or brain
damage," while a mental disease is an "Axis I psychopathology" or "primary
psychiatric disorders, like schizophrenia or bipolar disorder."[14]  (Docket No. 364-

---

[14]     Axis I refers to the first axis of the multiaxial system used in the previous
version of the American Psychiatric Association's Diagnostic and Statistical
Manual of Mental Disorders (DSM), the standard classification of mental
disorders used by mental health professionals in the United States.  *See*
http://www.psychiatry.org/psychiatrists/practice/dsm (visited 11/12/15.)  In 2009
when Dr. Dietz and Dr Martell were deposed, the DSM-IV TR was the most
current version of the DSM.  (Docket No. 364 at Page ID# 753.)  Axis 1 included
all psychological diagnostic categories except mental retardation and personality
disorders.  Axis II included personality disorders and mental retardation.  The
DSM-5, introduced in 2013, eliminated the multiaxial system. *See*
http://tpcjournal.nbcc.org/the-removal-of-the-multiaxial-system-in-the-dsm-5-impl
ications-and-practice-suggestions-for-counselors.  (visited 11/12/15.)

1 at Page ID# 842.)  Additionally, Dr. Martell testified that only "an Axis I mental disease or defect . . . would undermine the ability to be competent." (*Id.*)  Like Dr. Dietz, Dr. Martell emphasized the essential  cyclical nature of bipolar disorder. (*Id.* at Page ID# 844.)

Dr. Martell noted that Petitioner reported no psychiatric history pre-incarceration, Petitioner had no prior diagnosis of a mental illness and none of the psychological testing Dr. Martell conducted found evidence of an Axis I disorder. (*Id.* at Page ID## 861-63.)  Dr. Martell opined that Petitioner "clearly meets the antisocial personality criteria but he also has narcissistic and obsessive-compulsive personality traits" which would support a diagnosis of personality disorder NOS (not otherwise specified) or antisocial personality disorder with narcissistic and obsessive compulsive features; both encompassing the "same group/constellation of symptoms: antisocial, narcissistic and obsessive-compulsive." (*Id.* at Page ID# 861.)

Dr. Martell explained that the treatment for an Axis II disorder is "generally talk therapy" and he emphasized that personality disorder are "pretty difficult to treat" while "antisocial personality [disorder is] very difficult to treat." (*Id.* at Page ID# 863.)  Dr. Martell suggested that "[o]ften the best way to treat [antisocial personality disorder] is with age, rather than anything active," because as people get older they have less energy to hurt other people.  (*Id.*)  Dr. Martell explained that some psychiatrists will prescribe medication to someone with a personality disorder, "mostly tranquilizers and things like that to take the edge off," but, Dr. Martell noted that "by and large it's a process of psychological uncovering and exploration and, . . . reframing in a way that helps the person to recognize what they do that is abnormal in their relations with others, . . . and institute new behaviors to change that."  (*Id.*)[15/]  Dr. Martell concluded that

---

[15/]     In his March 24, 2009 deposition, Dr. Dietz opined that psychotherapy was the appropriate treatment for narcissistic personality disorder and that psychotropic drugs were not appropriate treatment.  (*See* Docket No. 364 at Page ID# 768.)

1  Petitioner is not incompetent but "he's difficult to work with because of his
2  character pathology." (*Id.*. at Page ID# 869.)

3      In his Supplemental Brief responding to the change in law wrought by
4  *Gonzales*, Petitioner asserted for the first time that he could be returned to
5  competence with proper care and treatment.  In support of this assertion, he
6  presented a declaration from Dr. Rosenthal in which he explained that he believes
7  Petitioner "most probably suffers from a bipolar disorder or a schizoaffective
8  disorder." (Docket 377-1 at Page ID# 1009.)  Based on presumption that one of
9  these disorders is an accurate diagnosis, Dr. Rosenthal explained how Petitioner
10  might be treated.  Initially, Dr. Rosenthal noted that Petitioner has never been
11  treated for his mental disease, and left untreated, Petitioner's condition will not
12  improve. (*Id.* at Page ID# 1010.)  Then, Dr. Rosenthal suggested that "with
13  treatment, including the use of medications, there is a fairly good prospect that
14  Mr. Clark could relinquish his delusional ideas about his case, acquire the ability
15  to think in a more organized way and cooperate with his attorneys." ( *Id.*)
16  Importantly, Dr. Rosenthal stated that "[t]o achieve this goal, Mr. Clark must first
17  be willing to be treated." (*Id.*)  Dr. Rosenthal then described the medication he
18  believes might help Petitioner. (*Id.* at Page ID# 1010-11)  Dr. Rosenthal did not
19  suggest how long it might take for any such treatment to be sufficiently effective
20  that Petitioner would be well enough to rationally assist his counsel.  Respondent
21  did not submit any new information from his mental health experts.

22      While the evidence submitted by the parties strongly suggests that
23  Petitioner suffers from a personality disorder that does not render him
24  incompetent, the Court need not determine whether Petitioner is competent.  Even
25  assuming that he is incompetent, *Gonzales* requires the Court to ascertain whether
26  he can be returned to competence, and if so, whether he will regain competence in
27  the foreseeable future.  133 S.Ct. at 709.  While they may disagree about what ails
28  Petitioner, the medical experts for both parties agree that Petitioner does not
   believe that he has mental problems. (*See* Docket No. 358-2 at Page ID# 253,

Docket No. 364 at Page ID## 671-72.)  There is no evidence to suggest that
Petitioner has ever sought treatment or that he has ever been treated or received
medication for mental health issues prior to his incarceration.  Likewise, there is
no evidence to suggest that Petitioner has been treated or received medication for
any mental health issues during his long period of incarceration.  Moreover,
Petitioner "has never accepted the possibility that he has mental problems" and
believes that he is competent, and "wants to be found competent." (*Id.*)  Finally,
Dr. Rosenthal made clear that left untreated Petitioner's condition will not
improve. (*See* Docket No. 377-1 at Page ID# 1010.)  It is difficult to imagine a
scenario in which Petitioner could be returned to competence when he does not
now believe, nor does the evidence suggest he has ever believed, that he has any
conditions that might render him incompetent.  It is worth recalling that Dr.
Rosenthal, Petitioner's own mental health expert, warned that the *only* way to
enable Petitioner to "relinquish his delusional ideas about his case, acquire the
ability to think in a more organized way and cooperate with his attorneys" is for
Petitioner to "first be willing to be treated." (*Id.*)  Since Petitioner does not
believe that he suffers from any mental health conditions that require treatment,
the possibility that he will accept treatment is virtually nil.

Even assuming that Petitioner would consent to treatment, the evidence
presented is entirely unclear about whether Petitioner could be returned to
competence in the foreseeable future.  Assuming that Petitioner suffers from a
bipolar or schizoaffective disorder as suggested by Dr Rosenthal, at best, "there is
a fairly good prospect" that Petitioner could be returned to competence. (*Id.*)  Dr.
Rosenthal does not express any opinion about how long treatment might take, but
the fact that, by all accounts, Petitioner has been exhibiting the same
dysfunctional behavior at least since the time of his trial, suggests that treatment
would not be brief.

To return Petitioner to competence Dr. Rosenthal recommends the use of
medications, specifically, Lithium, Depakote and Ability, combined with

supportive therapy.  However, Petitioner fails to offer any information; research, studies or academic articles, for example, to support the efficacy of Dr. Rosenthal's suggested treatment or the potential duration of treatment before positive results can be expected.[16/]  Additionally, Petitioner has not demonstrated that the State has a legal obligation to provide the treatment Dr. Rosenthal recommends to restore Petitioner's competence.  Indeed, Petitioner has never been treated for any mental health issues while incarcerated, suggesting that, to the extent that they exist, his mental health issues have not interfered with his adjustment to incarceration.  In addition, there is no clear precedent establishing that this Court has the authority to mandate that the CDCR provide the treatment Dr. Rosenthal recommends; or that this Court could compel Petitioner to take the medications Dr. Rosenthal recommends as an essential part of restoring Petitioner's competence.  *See e.g. Mulder v. Baker*, No. 3:09-cv-00610 PMP-WGC, 2013 WL 5758061, *5 (D. Nev. Oct. 23, 2013); *Gates v. Chappell*, No. C 88-2779 WHA, 2014 WL 5810619, *4 (N.D. Cal. Nov. 7, 2014).  Moreover, the Court need not disregard the fact that prior to *Gonzales*, Dr. Rosenthal had never suggested that Petitioner could be returned to competence with treatment, and that in doing so now, Dr. Rosenthal appears to be doing little more than attempting to comply with the requirements of *Gonzales*.  *See Mulder*, 2013 WL 5758061 at *5.

If Petitioner suffers from a personality disorder, as Respondent's experts opine, and assuming for the sake of argument that this personality disorder renders Petitioner incompetent, which Respondent's experts dispute, the possibility of Petitioner being returned to competence in the foreseeable future is all but extinguished.  As Dr. Martell explained, personality disorders "are very difficult to treat," often the best way to treat a personality disorder is with "age,"

---

[16/]     Petitioner cannot be heard to complain that such evidence would be forthcoming at oral argument or an evidentiary hearing where he has consistently maintained that this issue is ripe for decision and that Petitioner's competence is now at issue and can be decided on the merits without the necessity of an evidentiary hearing or live testimony.  (*See* Docket No. 367 at Page ID## 888, 893.)

allowing the natural aging process to diminish the desire to hurt other people, and through the psychotherapeutic process of "uncovering and explor[ing] and hopefully, reframing in a way that helps the person to recognize what they do that is abnormal in their relations with others, recognize when they're doing it, and institute new behaviors to change it." (Docket No. 364-1 at Page ID# 863.) Neither aging nor psychotherapy amount to a reasonably quick fix.

In light of the foregoing, even assuming that Petitioner is incompetent and would consent to treatment to be returned to competence, Petitioner has failed to offer any evidence to suggest that there is any "reasonable hope" that Petitioner "will regain competence in the foreseeable future." *Gonzales*, 133 S.Ct. at 709. Thus, even if the Court found that Petitioner has claims that could benefit from his ability to rationally communicate with counsel, a stay would be inappropriate.

2. Even if Extra-record Evidence Was Permitted, Petitioner Fails to Demonstrate that This Evidence is Necessary to the Proper Presentation of his Claims.

Even assuming that the possibility of a stay remained available, Petitioner has failed to demonstrate that a stay is necessary because he has not established that his claims could substantially benefit from his assistance.

a. Petitioner's Input is Not Necessary to the Proper Presentation of Claims 1 and 2

In Claim 1 of the Amended Petition, Petitioner contends that the trial court violated his rights under the Fifth, Sixth and Fourteenth Amendments when it "improperly denied, or failed to grant, Petitioner's requests for self-representation made prior to the commencement of trial." (Docket No. 281 at 4.)[17/] Specifically, Petitioner contends that on December 15, 1981, July 26, 1982, August 13, 1982, August 19, 1982, August 20, 1982, August 25, 1982, September 7, 1982, September 20, 1982, and October 4, 1982 he requested, or renewed his request, to represent himself, and each time the trial court improperly denied his request. In Claim 2, Petitioner contends that the trial court

---

[17/]   Because the Amended Petitioner was not electronically filed, the Court cites to the page numbers of the document rather than the Page ID#.

42

violated his rights under the Fifth, Sixth and Fourteenth Amendments when it "improperly denied and restricted Petitioner's right to self-representation after the commencement of trial." *Id.* at 9.  Specifically, Petitioner contends that on least three occasions the trial court improperly denied, then granted, then revoked and then granted again Petitioner's right to represent himself.

Petitioner alleges that in order to properly present these two *Faretta* claims he must be able to rationally communicate with counsel so that counsel may "determine the cause" of Petitioner's request to represent himself.  (Docket No. 377 at Page ID# 998.) With respect to Claim 1 counsel wish to understand the nature and extent of the conflict between Petitioner and his trial counsel so that they know what "caused Petitioner to invoke his *Faretta* rights so frequently."  (*Id.*)  With respect to Claim 2 counsel wish to communicate with Petitioner "in order to determine . . . how Petitioner" would have cross-examined a prosecution witness, "how Petitioner would have conducted his defense," the "offers of proof and investigation" he would have made, "how Petitioner's *pro per* defense was affected by the denial of [his] request for advisory counsel" and how trial counsel's representation "created a conflict of interest and differed from what Petitioner would have done" had he been able to represent himself.  (*Id.* at Page ID# 1000.)  Petitioner's counsel may indeed wish that Petitioner could communicate rationally regarding all of the foregoing issues, however none of this information is necessary to the determination of his claims.

Under the Sixth Amendment, a criminal defendant has the right to waive his right to counsel and represent himself.  *See Faretta v. California*, 422 U.S. 806, 835 (1975); *see also Indiana v. Edwards*, 554 U.S. 164 (2008); *Robinson v. Kramer*, 588 F.3d 1212, 1216 (9th Cir. 2009).  Unlike the Sixth Amendment right to counsel, the right to self-representation does not attach until asserted.  *See Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir. 2000).  To be effective, a defendant's request to represent himself must be competently and intelligently made, and the trial court "must satisfy itself that the waiver of [the defendant's] constitutional right [to counsel] is knowing and voluntary." *Faretta*, 422 U.S. at 835; *Iowa v. Tovar*, 541 U.S. 77, 88 (2004); *Godinez v. Moran*, 509 U.S.

43

389, 400 (1993). Additionally, a request for self-representation must be unequivocal, timely, and not a tactic to secure delay. *Faretta*, 422 U.S. at 835; *Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007).

Whether there is a proper waiver should be determined by the trial court and any such waiver should appear on the record. *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938). The trial court need not "engage in a specific colloquy." *Lopez v. Thompson*, 202 F.3d 1110, 1118 (9th Cir. 2000). However, at a minimum, a defendant must be made aware of "three 'critical elements' of self-representation: (1) 'the nature of the charges against him'; (2) 'the possible penalties'; and (3) 'the dangers and disadvantages of self-representation.'" *McCormick v. Adams*, 621 F.3d 970, 976 (9th Cir. 2010); *see also United States v. Dujanovic*, 486 F.2d, 182, 186 (9th Cir. 1973) (concluding that "[w]e cannot visualize a less minimal requirement than the District Court shall not grant a request to waive counsel and proceed pro se without addressing the accused personally and determining on the record that the demand to waive counsel and proceed pro se is competently and intelligently made with understanding of the nature of the charge and the penalties involved").[18]

Consequently, determining whether the trial court improperly denied Petitioner's *Faretta* rights does not turn on the nature of the conflict between Petitioner and his trial counsel, nor must the Court know what "caused" him to waive counsel. Indeed,

> [t]he reasons for one charged with [a] crime to waive the
> assistance of competent counsel in any given case range from
> the misguided or naive who just wants to tell the jury the
> truth, through the pressured one under the hardships of the
> accusation of crime and the sophisticated person enamored

---

[18] Notably, where the Court fails to discuss the "three critical elements" it may look to "'the particular facts and circumstances surrounding that case including the background, experience and conduct of the accused' to determine whether the waiver was knowing and intelligent despite the absence of a specific inquiry on the record." *United States v, Kummel*, 672 F.2d 720, 722. However, Petitioner does not claim that he did not understand the consequences of his waiver. Rather, he claims that the Court did not honor his repeated requests to exercise the right of self-representation.

with his own ability, to the crafty courtroom experienced one
who ruthlessly plays for the breaks.  All eventually play the
part of the proverbial fool.  Accordingly, reasons for the
waiver are not the concern of the trial court.

*Dujanovic*, 486 F.2d at 186.  Thus, even if Petitioner could communicate rationally with counsel and meaningfully respond to counsels' queries, nothing Petitioner communicates would be necessary for the proper presentation of his *Faretta* claims.  What is more, even if Petitioner's reasons for choosing to represent himself were relevant to the Court's *Faretta* inquiry, Petitioner fails to explain the relevance of the specific information counsel seeks.  It must be remembered that Petitioner is not claiming that his *Faretta* waiver was flawed.  Instead, in Claims 1 and 2 Petitioner argues that he was denied the right to waive counsel in violation of *Faretta*. Nowhere does Petitioner suggest how knowing what prompted his decision to waive counsel or the nature and extent of Petitioner's alleged conflict with his trial counsel would aid his habeas counsel in presenting these two claims.

b.    Petitioner's Input is Not Necessary to the Proper
Presentation of Claim 8

In Claim 8 of the Amended Petition, Petitioner alleges that his trial counsel, Mr. Keith, rendered ineffective assistance for the following reasons:

(1)    failing to disclose his serious alcohol problems which had caused him financial hardship;

(2)    failing to move to withdraw after there was a complete breakdown in the attorney-client relationship;

(3)    failing to effectively conduct *voir dire*;

(4)    failing to offer expert testimony regarding the admissibility of voice identifications;

(5)    failing to oppose the State's motion for leave to show photographs of the victims' bodies during opening statements (although they were ultimately excluded by the trial court);

45

(6)     calling Carol Bundy as a defense witness, but being

unprepared to examine her;

(7)     failing to obtain Carol Bundy's psychiatric reports;

(8)     eliciting damaging testimony from Ms. Bundy;

(9)     introducing the entirety of Ms. Bundy's taped

statement to the police;

(10)    allowing Petitioner to testify without first preparing

him and eliciting damaging testimony from him;

(11)    failing to investigate or prepare a third party defense,

failing to properly raise the issue of privilege in support of

Petitioner's initial motion to suppress;

(12)    failing to seek the return of Petitioner's seized legal

work-product;

(13)    failing to bring a motion to suppress materials and

statements illegally obtained by the State;

(14)    failing to seek the recusal of the trial judge;

(15)    failing to properly prepare guilt phase closing

argument;

(16)    failing to object to irrelevant and damaging guilt

phase jury instructions;

(17)    calling two expert witnesses over Petitioner's

objections and eliciting damage testimony from them;

(18)    failing to call experts to rebut evidence offered by the

State;

(19)    during the penalty phase failing to properly prepare

mitigation evidence and witnesses and failing to obtain

necessary expert witnesses;

(20)    requesting that the Court allow Petitioner to give

closing arguments;

(21)    giving inadequate closing arguments;

(22)    failing to adequately present mitigating evidence;

(23)    failing to object to, or seek to exclude, highly inflammatory, prejudicial and inadmissible evidence;

(24)    after having his initial motion for an evidentiary hearing to determine Petitioner's competency denied, failing to pursue throughout trial and via appellate review a motion to determine Petitioner's competence to stand trial or waive counsel.

(Docket No. 281 at 33-39.)

With respect to Claim 8, Petitioner asserts that counsel must communicate rationally with Petitioner regarding the conflict of interest and lack of communication between Petitioner and his trial counsel.  (Docket No. 377 at Page ID# 1001.) Additionally, counsel wish to know the "back story" that lead trial counsel to call Carol Bundy as a witness.  (*Id.*)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  A habeas reviewing court can "'neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight' . . . but rather, will defer to counsel's sound trial strategy."  *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir.2001) (citing *Strickland* ).  Instead, the court must determine whether, in light of the circumstances as

47

they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

With respect to prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*., at 687.

Even if Petitioner could rationally communicate with his habeas counsel and tell them about his conflict with his trial counsel, the lack of communication between them and the "back story" which resulted in Carol Bundy being called as a defense witness, Petitioner's has failed to demonstrate that such communication is essential to counsel's presentation of Claim 8. For example, while Petitioner's notes that the record is silent as to why Mr. Keith called Ms. Bundy, the best Petitioner can do is argue that "the bare trial court record suggests that the 'back story' is essential to" the proper presentation of this claim. (Docket No. 377 at Page ID# 1001.) Petitioner offers no clue as to why he believes this is so or how it matters to his presentation of Claim 8. Likewise, Petitioner notes that although referenced in the record, the conflict of interest and lack of communication between Petitioner and Mr. Keith was "never explained." (*Id.*) Petitioner contends that this conflict "severely and detrimentally affected Petitioner's testimony at trial." (*Id.*) Nevertheless, Petitioner does not even minimally suggest why this matters in the context of presenting Claim 8.

Moreover, even assuming that Petitioner could rationally communicate with counsel regarding the "back story" that resulted in Ms. Bundy testifying for the defense,

48

1   Petitioner's current memory of events that occurred more than thirty years ago would be

2   of little, if any, help to his cause.  As the Supreme Court cautioned in *Strickland*:

3            Judicial scrutiny of counsel's performance must be highly

4            deferential. It is all too tempting for a defendant to

5            second-guess counsel's assistance after conviction or adverse

6            sentence, and it is all too easy for a court, examining

7            counsel's defense after it has proved unsuccessful, to

8            conclude that a particular act or omission of counsel was

9            unreasonable.  A fair assessment of attorney performance

10           requires that every effort be made to eliminate the distorting

11           effects of hindsight, to reconstruct the circumstances of

12           counsel's challenged conduct, and to evaluate the conduct

13           from counsel's perspective at the time.  Because of the

14           difficulties inherent in making the evaluation, a court must

15           indulge a strong presumption that counsel's conduct falls

16           within the wide range of reasonable professional assistance;

17           that is, the defendant must overcome the presumption that,

18           under the circumstances, the challenged action "might be

19           considered sound trial strategy."

20   *Id.* at 689-90.  Moreover, Petitioner's negative perception of Mr. Keith's performance

21   thirty years ago, which is amply evidenced in the record, even if relevant, would make

22   eliminating the "distorting effects of hindsight" virtually impossible and would be of little

23   assistance in understanding trial counsel's strategic decisionmaking. *Id.; see also*

24   *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (noting that *Strickland* . . . calls for an

25   inquiry into the objective unreasonableness of counsel's performance, not counsel's

26   subjective state of mind.)  In *Richter*, the Supreme Court cautioned that "[a]fter an

27   adverse verdict at trial even the most experienced counsel may find it difficult to resist

28   asking whether a different strategy might have been better, and, in the course of that

    reflection, to magnify their own responsibility for an unfavorable outcome."  *Richter*, 562

U.S. at 109.  Relying on Petitioner's memory of events in assessing the reasonableness of trial counsel's performance would turn this admonition on its head.

### Conclusion

Accordingly, based on the foregoing:

1.      The provisions of AEDPA govern these proceedings.

2.      Petitioner's Motion to Stay Pending Capital Habeas Proceedings During Petitioner's Incompetence (Docket No. 358) is DENIED.

3.      Within 90 days of the date of this order, Petitioner shall file his Opening Brief addressing the merits of all the claims and, demonstrating, for each claim, the California Supreme Court's violation of § 2254(d) on the basis of the state court record and consistent with the United States Supreme Court's holdings in *Harrington v. Richter*, 131 S. Ct. 770 (2011) and *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).  Petitioner's Opening Brief shall not exceed 150 pages.

4.      Within 90 days after service of Petitioner's Opening Brief, Respondent shall file an Opposition Brief which shall not exceed 150 pages.

5.      Petitioner's Reply Brief, if any, shall be filed within 60 days after service of Respondent's Opposition brief, and shall be limited to no more than 50 pages.

6.      The parties need not include a lengthy discussion of the facts, testimony, or exhibits adduced at trial or on appeal.  A lengthy recitation of the procedural background is also unnecessary.  Those materials and that information are available in multiple other documents previously submitted by the parties, including the core pleadings.  Rather the parties shall focus on legal arguments with citations to those portions of the record or exhibits where support for their arguments can be found.

7.      The briefing set forth above shall not include or discuss any procedural bar challenges, should any exist, because the Court will first consider Petitioner's claims on the merits.  *See Lambrix v. Singletary*, 520 U.S. 518, 524-25, 117 S.Ct. 1517, 1523 (1997).  Should any of Petitioner's claims survive merits review, additional orders of the Court will be forthcoming.

8.    The Court will not increase the established page limits and it does not anticipate entertaining requests for extensions of time to file the ordered briefing.

9.    All briefing shall comport with the form and formatting requirements of Local Rule 11-3.

10.    The parties shall not submit paper copies of any briefing or exhibits either to chambers or to the Death Penalty Law Clerks.

**IT IS SO ORDERED**.

DATED:  April 22, 2016

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE